# Exhibit 1

1  Aimee H. Wagstaff (CA Bar No. 278480)
   Aimee.wagstaff@andruswagstaff.com
2  **ANDRUS WAGSTAFF, P.C.**
   7171 W. Alaska Dr.
3  Denver, CO 80226
   Tel: (720) 208-9403
4  Fax: (303) 376-6361

5

6  Kathryn M. Forgie (SBN 110404)
   Kathryn.forgie@andruswagstaff.com
7  **ANDRUS WAGSTAFF, PC**
8  6315 Ascot Drive
   Oakland, California 94611
9  Telephone: (720) 255-7623
   Facsimile: (888) 875-2889
10

11  **Attorneys for Plaintiffs**

12

13          **THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,**

14              **IN AND FOR THE COUNTY OF SONOMA**

15  JAIME ANDRADE, MILDRED ADAMS,          )  **JCCP 4953 – IN RE: Roundup Products**
16  RICHARD BARGAMIAN, RICKY               )
    BIRDSELL, JUDY BORDE, ERIC             )  CASE NO: SCV- 262127
17  BURGESS, JANICE CAMDEN, CHERYL         )
    CHAPMAN, CAROL COLUCCI, COLIN          )  **JUDGE: Hon. Iona Petrou**
18  CUNNINGHAM, ALFRED DELUCA,             )
19  RICHARD FULGENZI, BARRY FURSE,         )  **COMPLAINT FOR DAMAGES FOR:**
    BRADLEY GRIFFIN, RALPH LACAZE,         )
20  SHARON LUTTRELL, KATHY                 )  1) Strict Liability –Design Defect
    MALCOLM, MICHAEL O'CON, DAVID          )  2) Strict Liability – Failure To Warn
21  PASTORELLO, HAROLD ROY, JEFFREY        )  3) Negligence
22  SMITH, ROBERT STUMP, TINA              )  4) Breach Of Implied Warranty
    THOMPSON, MATTHEW TORRES,              )  5) Breach of Expressed Warranty
23  MICHELLE TYCZKI, ROBERT VELTRI,        )  6) Punitive Damage
    DONALD WAGNER,                         )
24              Plaintiffs,                )  **DEMAND FOR JURY TRIAL**
25      vs.                                )
                                           )
26  MONSANTO COMPANY;                      )
    WILBUR-ELLIS COMPANY, LLC, and         )
27  WILBUR-ELLIS FEED, LLC                 )
28              Defendants.                )

29                                      1
          COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

F I L E D
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA

MAR 1 2 2018

BY_____
       Deputy Clerk

BY FAX

**COMPLAINT AND DEMAND FOR JURY TRIAL**

COMES NOW, Plaintiffs, Jaime Andrade, Mildred Adams, Richard Bargamian, Ricky Birdsell, Judy Borde, Eric Burgess, Janice Camden, Cheryl Chapman, Carol Colucci, Colin Cunningham, Alfred Deluca, Richard Fulgenzi, Barry Furse, Bradley Griffin, Ralph Lacaze, Sharon Luttrell, Kathy Malcolm, Michael O'Con, David Pastorello, Harold Roy, Jeffrey Smith, Robert Stump, Tina Thompson, Matthew Torres, Michelle Tyczki, Robert Veltri, Donald Wagner, (hereinafter, collectively, "Plaintiffs") by and through their attorneys, Andrus Wagstaff, P.C., as and for the Complaint herein alleges upon information and belief the following:

**STATEMENT OF THE CASE**

1.      In 1970, Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

2.      Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an

estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

3.       Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

4.       On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

5.       On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6.       The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

7.       The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

8.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## JURISDICTION AND VENUE

9.     The California Superior Court has jurisdiction over this action pursuant to Constitution Article VI, Section 10, which grants the Superior Court "original jurisdiction in all causes except those given by statute to other trial courts." The Statutes under which this action is brought do not specify any other basis for jurisdiction.

10.     The California Superior Court has jurisdiction over the Defendants because, based upon information and belief, each is a California resident, a corporation and/or entity organized under the laws of the State of California, a foreign corporation or association authorized to do business in California and registered with the California Secretary of State or has sufficient minimum contacts in California, or otherwise intentionally avails itself of the California market so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court pursuant to California Code of Civil Procedure Section 395(a) because at all relevant times Plaintiff Jaime Andrade resided in this county and the injuries alleged herein arose from conduct that occurred in this county.

12.     Furthermore, the Defendants have purposefully availed themselves of the benefits and the protections of the laws within the State of California. Monsanto has had sufficient

---

4

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

contact such that the exercise of jurisdiction would be consistent with the traditional notions of fair play and substantial justice.

13.    Plaintiffs seek relief that is within the jurisdictional limits of the Court.

## THE PARTIES

### Plaintiffs

14.    Plaintiff Jaime Andrade is a resident and citizen of California and was at all relevant times a resident of California.  Mr. Andrade purchased and used Roundup for at least 28 continuous years through approximately 2016, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

15.    Plaintiff Mildred Adams is a resident and citizen of California and was at all relevant times a resident of California. Ms. Adams purchased and used Roundup for at least 8 continuous years through approximately 2017, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2015.

16.    Plaintiff Richard Bargamian is a resident and citizen of California and was at all relevant times a resident of California. Mr. Bargamian purchased and used Roundup for at least 40 continuous years through approximately 2016, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

17.    Plaintiff Ricky Birdsell is a resident and citizen of California and was at all relevant times a resident of California. Mr. Birdsell purchased and used Roundup for at least 10 continuous years through approximately 2016, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

18.    Plaintiff Judy Borde is a resident and citizen of California and was at all relevant times a resident of California. Ms. Borde purchased and used Roundup for at least 30

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

continuous years through approximately 2017, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

19.     Plaintiff Eric Burgess is a resident and citizen of California and was at all relevant times a resident of California. Mr. Burgess purchased and used Roundup for at least 15 continuous years through approximately 2007, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2008.

20.     Plaintiff Janice Camden is a resident and citizen of California and was at all relevant times a resident of California. Ms. Camden purchased and used Roundup for at least 40 continuous years through approximately 2017, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

21.     Plaintiff Cheryl Chapman is a resident and citizen of California and was at all relevant times a resident of California. Ms. Chapman purchased and used Roundup for at least 20 continuous years through approximately 2017, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2006.

22.     Plaintiff Carol Colucci is a resident and citizen of California and was at all relevant times a resident of California. Ms. Colucci purchased and used Roundup for at least 30 continuous years through approximately 2016, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

23.     Plaintiff Colin Cunningham is a resident and citizen of California and was at all relevant times a resident of California. Mr. Cunningham purchased and used Roundup for at least 10 continuous years through approximately 2016, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2015.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

24.     Plaintiff Alfred DeLuca is a resident and citizen of California and was at all relevant times a resident of California. Mr. DeLuca purchased and used Roundup for at least 20 continuous years through approximately 2017, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2006.

25.     Plaintiff Richard Fulgenzi is a resident and citizen of California and was at all relevant times a resident of California. Mr. Fulgenzi purchased and used Roundup for at least 20 continuous years through approximately 2014, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

26.     Plaintiff Barry Furse is a resident and citizen of California and was at all relevant times a resident of California. Mr. Furse purchased and used Roundup for at least 15 continuous years through approximately 2017, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

27.     Plaintiff Bradley Griffin is a resident and citizen of California and was at all relevant times a resident of California. Mr. Griffin purchased and used Roundup for at least 35 continuous years through approximately 2015, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

28.     Plaintiff Ralph Lacaze is a resident and citizen of California and was at all relevant times a resident of California. Mr. Lacaze purchased and used Roundup for at least 20 continuous years through approximately 2011, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

29.     Plaintiff Sharon Luttrell is a resident and citizen of California and was at all relevant times a resident of California. Ms. Luttrell purchased and used Roundup for at least 10

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

continuous years through approximately 2012, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2008.

30.     Plaintiff Kathy Malcolm is a resident and citizen of California and was at all relevant times a resident of California. Ms. Malcolm purchased and used Roundup for at least 25 continuous years through approximately 2012, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

31.     Plaintiff Michael O'Con is a resident and citizen of California and was at all relevant times a resident of California. Mr. O'Con purchased and used Roundup for at least 5 continuous years through approximately 2015, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2015.

32.     Plaintiff David Pastorello is a resident and citizen of California and was at all relevant times a resident of California. Mr. Pastorello purchased and used Roundup for at least 8 continuous years through approximately 2000, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2013.

33.     Plaintiff Harold Roy is a resident and citizen of California and was at all relevant times a resident of California. Mr. Roy purchased and used Roundup for at least 30 continuous years through approximately 2017, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

34.     Plaintiff Jeffrey Smith is a resident and citizen of California and was at all relevant times a resident of California. Mr. Smith purchased and used Roundup for at least 20 continuous years through approximately 2012, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2009.

35.     Plaintiff Robert Stump is a resident and citizen of California and was at all relevant times a resident of California. Mr. Stump purchased and used Roundup for at least 30 continuous years through approximately 2012, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

36.     Plaintiff Tina Thompson is a resident and citizen of California and was at all relevant times a resident of California. Ms. Thompson purchased and used Roundup for at least 10 continuous years through approximately 2014, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

37.     Plaintiff Matthew Torres is a resident and citizen of California and was at all relevant times a resident of California. Mr. Torres purchased and used Roundup for at least 15 continuous years through approximately 2017, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2007.

38.     Plaintiff Michelle Tyczki is a resident and citizen of California and was at all relevant times a resident of California. Ms. Tyczki purchased and used Roundup for at least 5 continuous years through approximately 2016, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

39.     Plaintiff Robert Veltri is a resident and citizen of California and was at all relevant times a resident of California. Mr. Veltri purchased and used Roundup for at least 20 continuous years through approximately 2011, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2009.

40.     Plaintiff Donald Wagner is a resident and citizen of California and was at all relevant times a resident of California. Mr. Wagner purchased and used Roundup for at least 20

9

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

continuous years through approximately 2016, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

**Defendants**

41.    Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.  At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®.  Monsanto has regularly transacted and conducted business within the state of California, and has derived substantial revenue from goods and products, including Roundup, used in the State of California.  Monsanto expected or should have expected their acts to have consequences within the State of California, and derived substantial revenue from interstate commerce.

42.    Defendants Wilbur-Ellis Company LLC is a California limited liability corporation with its headquarters and principal place of business in San Francisco, California.  At all times relevant to this complaint, Wilbur-Ellis Company, LLC sold and distributed Monsanto products including Roundup, within the State of California.

43.    Defendants Wilbur-Ellis Feed LLC (with Wilbur-Ellis Company LLC, hereinafter ("Wilbur-Ellis") is a California limited liability corporation with its headquarters and principal place of business in San Francisco, California.  At all times relevant to this complaint, Wilbur Ellis Feed, LLC sold and distributed Monsanto products including Roundup, within the State of California.

44.    Plaintiff is informed and believes, and based thereon alleges, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the Defendants was working within the course and scope of said agency, representation and/or

10

employment with the knowledge, consent, ratification, and authorization of the Defendants and their directors, officers and/or managing agents.

## FACTS

45.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

46.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

47.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®— glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup® was safe.

### *The Discovery of Glyphosate and Development of Roundup®*

11

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

48.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use; Monsanto still markets Roundup® as safe today.

*Registration of Herbicides under Federal Law*

49.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

50.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

51.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

52.     The EPA and the State of California registered Roundup® for distribution, sale, and manufacture in the United States and the State of California.

53.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

54.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

55.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

***Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup***

56.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

57.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

58.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

59.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

60.     Three top executives of IBT were convicted of fraud in 1983.

61.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

62.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

63.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

64.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

65.     Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has known for decades that it falsely advertises the safety of Roundup®.***

66.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a)      Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b)      And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)      Roundup biodegrades into naturally occurring elements.

d)      Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)      This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f)      You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)      Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)      Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i)      You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j)      "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

67.      On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)      its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk. ***

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

b)      its glyphosate-containing pesticide products or any component thereof

manufactured, formulated, distributed or sold by Monsanto are biodegradable

***

c)      its glyphosate-containing pesticide products or any component thereof

stay where they are applied under all circumstances and will not move through

the environment by any means. ***

d)      its glyphosate-containing pesticide products or any component thereof

are "good" for the environment or are "known for their environmental

characteristics." * * *

e)      glyphosate-containing pesticide products or any component thereof are

safer or less toxic than common consumer products other than herbicides;

f)      its glyphosate-containing products or any component thereof might be

classified as "practically non-toxic."

68.     Monsanto did not alter its advertising in the same manner in any state other than

New York, and on information and belief still has not done so today.

69.     In 2009, France's highest court ruled that Monsanto had not told the truth about

the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had

falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### *Classifications and Assessments of Glyphosate*

70.     The IARC process for the classification of glyphosate followed the stringent

procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has

reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known

Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to

18

be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

71.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

72.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

73.     In assessing an agent, the IARC Working Group reviews the following information:

    a)     human, experimental, and mechanistic data;

    b)     all pertinent epidemiological studies and cancer bioassays; and

    c)     representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

19

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

74.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

75.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

76.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

77.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

78.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

79.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

80.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

81.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

82.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

83.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

84.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

85.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of

21
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

86.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

87.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

### Release Patterns

88.    Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal, and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied.

Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

89.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### Recent Worldwide Bans on Roundup®/Glyphosate

90.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

91.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

92.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

93.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

94.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

95.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

96.     On information and belief, Wilbur-Ellis was, at all relevant times, engaged in the distribution of Roundup, Roundup-ready crops and other glyphosate-containing products from Monsanto to retailers and commercial/agricultural users in California.

97.     Wilbur-Ellis had superior knowledge compared to Roundup users and any consumers including regarding the carcinogenic properties of the product, yet failed to accompany its sales and/or marketing of Roundup with any warnings or precautions for that grave danger. On information and belief, Wilbur-Ellis was one of the distributors providing Roundup and other glyphosate-containing products actually used by the Plaintiffs.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

98.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

99.     The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiffs the true risks associated with Roundup and glyphosate.

100.    At all relevant times, Defendant has maintained that Roundup is safe, non-toxic,

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

and non-carcinogenic.

101.    Indeed, even as of July 2016, Defendant continues to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and *agree* that there is *no evidence* that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic" (emphasis added).[1]

102.    As a result of Defendant's actions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiffs to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

103.    Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiffs or to distributors of Roundup. In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

104.    Plaintiffs had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiffs could not have reasonably discovered the wrongdoing at any time prior. Also, the

---

[1] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiffs and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## COUNT I
## STRICT LIABILITY (DESIGN DEFECT)

105.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

106.    Plaintiffs bring this strict liability claim against Monsanto for defective design.

107.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, and Monsanto engaged in the marketing, packaging design, and promotion of Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiffs, as described above.

108.    At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiffs.

109.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

110.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

111.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

112.    At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

113.    Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

a) When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b) When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c) When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d) Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

e) Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f) At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g) Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

h) Monsanto could have employed safer alternative designs and formulations.

114.   Plaintiffs were exposed to Roundup® products in the course of their work, as described above, without knowledge of their dangerous characteristics.

115.   At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

116.   Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

117.   The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

118.   At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

119.   Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiffs herein.

120.   Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to Plaintiffs.

121. The defects in Roundup® products caused or contributed to cause Plaintiffs' grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiffs would not have sustained their injuries.

122. Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Plaintiffs, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn, or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

123. As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiffs have suffered and continue to suffer grave injuries, and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT II
## STRICT LIABILITY (FAILURE TO WARN)

124. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

125. Plaintiffs bring this strict liability claim against Monsanto for failure to warn.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

126.   At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and, specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

127.   Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiffs, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

128.   At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiffs of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

129.   At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

130.   At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including Plaintiffs.

131.   Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, marketed, promoted, supplied, or sold the product, and not known to end users and consumers, such as Plaintiffs.

132.   These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

133.   At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted, and marketed by Monsanto.

134.   Plaintiffs were exposed to Roundup® products in the course of their employment and/or personal use of Roundup, without knowledge of its dangerous characteristics.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

135.   At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

136.   Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiffs' exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Monsanto.

137.   These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and landscaping applications.

138.   The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

139.   To this day, Monsanto has failed to adequately and accurately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

140.   As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by Plaintiffs in their work.

141.   Monsanto is liable to Plaintiffs for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

142.   The defects in Roundup® products caused or contributed to cause Plaintiffs' injuries, and, but for this misconduct and omissions, Plaintiffs would not have sustained their injuries.

143.   Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiffs could have avoided the risk of developing injuries as alleged herein.

144.   As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiffs have suffered severe injuries and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00) together with interest, costs herein incurred, and all such

34

other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT III
## NEGLIGENCE

145.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

146.   Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs.

147.   At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

148.   At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

149.   At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

150.   Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

could cause or be associated with Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

151.    Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

152.    As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

153.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

154.    Monsanto was negligent in the following respects:

a)      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b)      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently

36

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c)    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d)    Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e)    Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f)    Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

g)    Failing to disclose to Plaintiffs, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h)    Failing to warn Plaintiffs, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other consumers;

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

i)      Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j)      Representing that its Roundup® products were safe for their intended use when, in fact,        Monsanto knew or should have known that the products were not safe for their intended purpose;

k)      Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l)      Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m)      Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n)      Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

155.   Monsanto knew and/or should have known that it was foreseeable that consumers such as Plaintiffs would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

156.   Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

38

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

157.    Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, as described herein.

158.    Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of its products, including Plaintiffs, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

159.    As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiffs have suffered severe and permanent physical and emotional injuries. Plaintiffs have endured pain and suffering and have suffered economic losses (including significant expenses for medical care and treatment) in an amount to be determined.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00) together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT IV
## BREACH OF IMPLIED WARRANTIES

160.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

161.     At all times herein mentioned, the Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup as a broad-spectrum herbicide. These actions were under the ultimate control and supervision of Defendant.

162.     At the time Defendant marketed, sold, and distributed Roundup for use by Plaintiffs, Defendant knew of Roundup's intended use and impliedly warranted the product to be or merchantable quality and safe and fit for this use.

163.     The Defendant impliedly represented and warranted to Plaintiffs and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

164.     These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

165.     Plaintiffs and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

166.     Plaintiffs reasonably relied upon the skill and judgment of Defendant as to whether Roundup was of merchantable quality and safe and fit for its intended use.

167.     Roundup was injected into the stream of commerce by the Defendant in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

168.     The Defendant breached the aforesaid implied warranties, as its herbicide Roundup was not fit for its intended purposes and uses.

169.     As a result of the foregoing acts and omissions, Plaintiffs suffered from NHL and Plaintiffs suffered severe and personal injuries which are permanent and lasting in nature,

physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demands a jury trial on all issues contained herein.

## COUNT V
## BREACH OF EXPRESS WARRANTY

170.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

171.    At all relevant and material times, Defendant manufactured, distributed, advertised, promoted, and sold Roundup.

172.    At all relevant times, Defendant intended that the Defendant's Roundup be used in the manner that Plaintiffs used it, and Defendant expressly warranted that each Roundup product was safe and fit for use by consumers, that it was of merchantable quality, that its health and side effects were minimal, and that it was adequately tested and fit for tis intended use.

173.    At all relevant times, Defendant was aware that consumers, including Plaintiffs, would use Roundup products; which is to say that Plaintiffs were a foreseeable user of the Defendant's Roundup products.

174.    Plaintiffs purchased Roundup manufactured by Defendant.

175.   Defendant's Roundup products were expected to reach and did in fact reach consumers, including Plaintiffs, without any substantial change in the condition in which it was manufactured and sold by Defendant.

176.   Defendant expressly warranted that Roundup was safe and not dangerous to users.

177.   Defendant expressly represented to Plaintiffs, scientists, the agricultural community, and/or the EPA that Roundup was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce dangerous side effects in excess of those risks associated with other forms of herbicides, that the side effects it did produce were accurately reflected in the warnings, and that it was adequately tested and fit for its intended use.

178.   Defendant breached various express warranties with respect to Roundup including the following particulars: a) Defendant Monsanto's website expressly states that "[r]egulatory authorities and independent experts around the world have reviewed numerous long term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate based herbicides, causes cancer, even at very high doses, and that it is not genotoxic"[2] b) Defendant has expressly warrantied that Roundup is "safer than table salt" and "practically nontoxic."[3]

179.   Roundup did not conform to these express representations because Roundup was not safe and had, at all relevant times, an increased risk of serious side effects, including non-Hodgkin's lymphoma, when used according to Defendant's instructions.

---

[2] http://www.monsanto.com/glyphosate/documents/no-evidence-of-carcinogenicity.pdf October 8, 2015.
[3] Reuters, Jun 14, 2015 UPDATE 2-French minister asks shops to stop selling Monsanto Roundup weedkiller.

42

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

180.    Defendant fraudulently concealed information from Plaintiffs regarding the true dangers and relative risks of Roundup.

181.    The global scientific community is not, and was never, in agreement that Roundup is non-carcinogenic.

182.    Plaintiffs did rely on the express warranties of the Defendant herein.

183.    Plaintiffs, consumers, and members of the agricultural community relied upon the representation and warranties of the Defendant for use of Roundup in recommending, using, purchasing, mixing, handling, applying, and/or dispensing Roundup.

184.    The Defendant herein breached the aforesaid express warranties, as its product Roundup was defective.

185.    Defendant knew or should have known that, in fact, said representations and warranties were false, misleading, and untrue in that Roundup was not safe and fit for the use intended, and, in fact, produced serious injuries to the users that were not accurately identified and represented by Defendant.

186.    Defendant knew or should have known that, in fact, said warranties were false, misleading, and untrue in that there is evidence that Roundup is toxic, genotoxic, and carcinogenic and that scientists and/or regulatory authorities around the world are not in agreement that Roundup is not carcinogenic or genotoxic and that it is safe.

187.    As a result of the foregoing acts and omissions, the Plaintiffs suffered from life threatening NHL and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

188.    As a result of the foregoing acts and omissions, Plaintiffs have suffered and incurred damages, including medical expenses and other economic and non-economic damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## COUNT VI
## PUNITIVE DAMAGES

189.    Plaintiffs repeat and reiterate the allegations previously set forth herein.

190.    At all times material hereto, the Defendants knew or should have known that the product was inherently dangerous with respect to its health risk.

191.    At all times material hereto, the Defendants attempted to misrepresent and did misrepresent facts concerning the safety of the subject product.

192.    Defendants' misrepresentations included knowingly withholding material information from the public, including the Plaintiffs herein, concerning the safety of the subject products.

193.    At all times material hereto, the Defendants knew and recklessly disregarded the fact that human exposure to Roundup can and does cause health hazard, including non-Hodgkin's lymphoma.

194.    Notwithstanding the foregoing, the Defendants continued to aggressively market and apply the subject product without disclosing the aforesaid risks.

195.    Defendants knew of the subject products' defective and unreasonably dangerous nature as set forth herein, but continued to design, develop, manufacture, market, distribute, sell and apply it so as to maximize sales and profits at the expense of the health and safety of the

44

public, including the Plaintiffs herein, in conscious and/or negligent disregard of the foreseeable harm caused by Roundup.

196.   The Defendants intentionally concealed and/or recklessly failed to disclose to the public, including the Plaintiffs herein, the potentially life threatening hazards of Roundup in order to ensure continued and increased sales.

197.   The Defendants' intentional and/or reckless failure to disclose information deprived the Plaintiffs of necessary information to enable Plaintiffs to weigh the true risks of using or being exposed to the subject product against its benefits.

198.   As a direct and proximate result of Defendants' conscious and deliberate disregard for the rights and safety of consumers such as the Plaintiffs, Plaintiffs suffered severe and permanent physical injuries. The Plaintiffs have endured substantial pain and suffering and have undergone extensive medical and surgical procedures. Plaintiffs have incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the future. The Plaintiffs have lost past earnings and have suffered a loss of earning capacity. The Plaintiffs have suffered and will continue to suffer economic loss, and have otherwise physically, emotionally and economically injured. The Plaintiff's injuries and damages are permanent and will continue into the future.

199.   The aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including the Plaintiffs herein, thereby deter them from similar conduct in the future.

WHEREFORE, Plaintiffs respectfully request judgement against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the court deems proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court enter judgment against the Defendant on each of the above-referenced claims and causes of action and as follows:

1.      Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.      Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiffs' pain and suffering and for severe and permanent personal injuries sustained by the Plaintiffs including health care costs and economic loss;

3.      Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

4.      Pre-judgment interest;

5.      Post-judgment interest;

6.      Awarding Plaintiffs reasonable attorneys' fees;

7.      Awarding Plaintiffs the costs of these proceedings; and

8.      Such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury as to all issues.

Dated: March 12, 2018

By: _____
Aimee H. Wagstaff
Andrus Wagstaff, P.C.
7171 W. Alaska Dr.
Lakewood, CO 80226
Tel: 720-208-9403
Fax: 303-376-6361

46

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Aimee.wagstaff@andruswagstaff.com

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

20998101

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
MONSANTO COMPANY; WILBUR-ELLIS COMPANY, LLC; and
WILBUR-ELLIS FEED, LLC

**F I L E D**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA

MAR 1 2 2018

BY _____
Deputy Clerk

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
JAIME ANDRADE (See Additional Parties Attachment)

**FILED**
ALAMEDA COUNTY

JUN 08 2018

CLERK OF THE SUPERIOR COURT
MICHELLE BANKS, Deputy

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: | CASE NUMBER: *(Número del Caso):* |
|---|---|
| *(El nombre y dirección de la corte es):* Sonoma- Hall of Justice 3600 Administration Drive Santa Rosas, CA 95403 | SCV - 262127 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Aimee H. Wagstaff, 7171 West Alaska Drive, Lakewood, CO 80226 (866) 795-9529

RG1 8 9 2 1 0 3 0

| DATE: *(Fecha)* MAR 1 2 2018 | ARLENE D. JUNIOR | Clerk, by *(Secretario)* GRISELDA ZAVALA | , Deputy *(Adjunto)* |
|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
[SEAL]
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

under: ☐ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Jaime Andrade, et al v. Monsanto Company et al | |

### INSTRUCTIONS FOR USE

➜ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➜ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (Check only one box. Use a separate page for each type of party.):

[x] Plaintiff   [ ] Defendant   [ ] Cross-Complainant   [ ] Cross-Defendant

MILDRED ADAMS, RICHARD BARGAMIAN, RICKY BIRDSELL, JUDY BORDE, ERIC BURGESS, JANICE CAMDEN, CHERYL CHAPMAN, CAROL COLUCCI, COLIN CUNNINGHAM, ALFRED DELUCA, RICHARD FULGENZI, BARRY FURSE, BRADLEY GRIFFIN, RALPH LACAZE, SHARON LUTTRELL, KATHY MALCOLM, MICHAEL O' CON, DAVID PASTORELLO, HAROLD ROY, JEFFREY SMITH, ROBERT STUMP, TINA THOMPSON, MATTHEW TORRES, MICHELLE TYCZKI, ROBERT VELTRI, and DONALD WAGNER

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

CEB
www.ceb.com

20998199

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|

Aimee H. Wagstaff, Esq. State Bar #278480
Andrus Wagstaff, PC
7171 W. Alaska Dr.
7Lakewood, Colorado 80226
TELEPHONE NO: (720) 208-9403     FAX NO: (303) 376-6361
ATTORNEY FOR (Name): Plaintiffs

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Sonoma
STREET ADDRESS: 600 Administration Drive
MAILING ADDRESS:
CITY AND ZIP CODE: Santa Rosa, 95403
BRANCH NAME: Civil Division

**FILED**
ALAMEDA COUNTY
JUL 23 2018
CLERK OF THE SUPERIOR COURT
By _Michelle Santos_

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA
MAR 1 2 2018
BY _____
Deputy Clerk

CASE NAME:
Jaime Andrade, et al        v. Monsanto Company, et al., Defendants.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: SCV-262127 |
|---|---|---|
| [✔] Unlimited (Amount demanded exceeds $25,000) [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter  [ ] Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: R18521530 DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[✔] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [✔] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [✔] Large number of separately represented parties        d. [✔] Large number of witnesses
   b. [✔] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve        e. [✔] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. [✔] Substantial amount of documentary evidence        f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [✔] monetary   b. [✔] nonmonetary; declaratory or injunctive relief   c. [✔] punitive
4. Number of causes of action (specify): 6
5. This case [ ] is [✔] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: March 9, 2018
Aimee H. Wagstaff
(TYPE OR PRINT NAME)                                        (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

BY FAX

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA<br>CIVIL DIVISION<br>600 ADMINISTRATION DRIVE, ROOM 107-J<br>SANTA ROSA, CALIFORNIA 95403-2878<br>(707) 521-6500<br>http://www.sonoma.courts.ca.gov<br><br>Andrade vs Monsanto Company | (FOR COURT USE ONLY)<br><br>**FILED**<br>ALAMEDA COUNTY<br><br>JUL 23 2018<br><br>CLERK OF THE SUPERIOR COURT<br>By _Michelle Banks_<br>MICHELLE BANKS, Deputy |
|---|---|
| **NOTICE OF ASSIGNMENT TO ONE JUDGE FOR ALL PURPOSES,**<br>**NOTICE OF CASE MANAGEMENT CONFERENCE,**<br>**and ORDER TO SHOW CAUSE** | Case number:<br>SCV-262181 SC21892139 |

## A COPY OF THIS NOTICE MUST BE SERVED WITH THE SUMMONS AND COMPLAINT AND WITH ANY CROSS-COMPLAINT

1. **THIS ACTION IS ASSIGNED TO HON. PATRICK BRODERICK  FOR ALL PURPOSES.**
Pursuant to California Rules of Court, Rule 2.111(7), the assigned judge's name must appear below the number of the case and the nature of the paper on the first page of each paper presented for filing.

2. EACH DEFENDANT MUST FILE A WRITTEN RESPONSE TO THE COMPLAINT AS REQUIRED BY THE SUMMONS.

     A Case Management Conference has been set at the time and place indicated below:

| Date:  Tuesday, 07/10/2018 | Time:  3:00 PM | Courtroom 16 |
|---|---|---|
| Location: 3035 Cleveland Avenue, Santa Rosa. CA 95403 | | |

3.  No later than 15 calendar days before the date set for the case management conference or review, each party must file a case management statement [Judicial Council form #CM-110] and serve it on all other parties in the case.  In lieu of each party's filing a separate case management statement, any two or more parties may file a joint statement.

4.  At the conference, counsel for each party and each self-represented party must appear personally or by telephone [California Rules of Court, Rule 3.670(c)(2)]; must be familiar with the case; and must be prepared to discuss and commit to the party's position on the issues listed in California Rules of Court, Rule 3.727.

5.  Pre-approved dispositions are recorded three (3) court days prior to the case management conference.  These may be obtained by calling (707) 521-6883 or by going to http://sonoma.courts.ca.gov/online-services/tentative-rulings.

### ORDER TO SHOW CAUSE
To Plaintiff(s), Cross-complainants, and/or their attorneys of record:
If, on the date shown above, you are not in compliance with the requirements stated in the California Rules of Court, rules 2.30, 3.110, and/or 3.720 through 3.771 inclusive, you must then and there show cause why this court should not impose monetary and/or terminating sanctions in this matter.

Pursuant to California Rule of Court, rule 3.221(b), information and forms related to Alternative Dispute Resolution are available on the Court's website at http://www.sonoma.courts.ca.gov/self-help/adr.

## ELECTRONIC SERVICE OF DOCUMENTS
### Enabled by Local Rule 18.16

Voluntary e-service is available in Sonoma County.  The Court has pre-approved a Stipulation for cases in which the attorneys or parties choose e-service. A copy of the Stipulation is available under the "Civil" section in the "Division" tab of the Court website: http://www.sonoma.courts.ca.gov.  The advantages of e-service to the parties include:

| | |
|---|---|
| SAVE MONEY | Reduction in costs related to photocopying, retrieving, storing, messenger and postage fees. No special software is needed to use e-service |
| SAVE TIME | Instant service of your documents on all parties |
| SAVE SPACE | With 24/7 internet access to all documents, you do not need to house paper copies |
| GAIN CERTAINTY | Immediate confirmation of service for your records. Documents are not delayed in the mail or blocked by email spam blockers and firewalls |

To take advantage of e-service, select an e-service provider and file the signed Stipulation with the Court. Parties can then e-serve documents through the selected provider. Information about e-service providers is available at the website for the Sonoma County Bar Association: http://www.sonomacountybar.org.  The Court does not endorse one provider over another.

**To learn more about available e-service providers and their fees, please visit their website**

*Note: Hard-copy pleadings are required to be filed with the Court in accordance with applicable provisions of the Code of Civil Procedure, California Rules of Court and local rules. You do not need to provide a courtesy copy of a served document to the specific department in which the matter has been assigned.*

## DISCOVERY FACILITATOR PROGRAM

Effective January 1, 2008, the Sonoma County Superior Court promulgated Sonoma County Local Rule 4.14 which established the Discovery Facilitator Program.  Participation in the Discovery Facilitator Program shall be deemed to satisfy a party's obligation to meet and confer under Sonoma County Local Rule 5.5 and applicable provisions of the Code of Civil Procedure and California Rules of Court.  This program has been providing assistance in resolving discovery disputes and reducing the backlog of matters on the law and motion calendars in our civil law departments.  The Sonoma County Superior Court encourages all attorneys and parties to utilize the Discovery Facilitator Program in order to help resolve or reduce the issues in dispute whether or not a discovery motion is filed.

There is a link to Local Rule 4.14 and the list of discovery facilitator volunteers on the official website of the Sonoma County Superior Court at http://www.sonoma.courts.ca.gov.  On the home page, under the "AVAILABLE PROGRAMS & HELP" section, click on »Discovery Facilitator Program.  You can then click on either "Local Rule 4.14" to obtain the language of the local rule, or "List of Facilitators" for a list of the volunteer discovery facilitators and accompanying contact and biographical information.

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|

Aimee Wagstaff, 36819
Andrus Wagstaff, PC
7171 West Alaska Drive
Lakewood, CO 80226
TELEPHONE NO.: (303) 376-6360
ATTORNEY FOR *(Name)*: Plaintiff

**FILED**

MAR 15 2018

SUPERIOR COURT OF CALIFORNIA,
COUNTY OF SONOMA
BY   MB   DEPUTY CLERK

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
Superior Court of California, Sonoma County
600 Administration Dr.
Santa Rosa, CA 95403-2818

**FILED**
ALAMEDA COUNTY

JUL 23 2018

CLERK OF THE SUPERIOR COURT
By _Michelle Danh_
MICHELLE BANKS, Deputy

PLAINTIFF/PETITIONER: Jaime Andrade, et al.

DEFENDANT/RESPONDENT: Monsanto Company, et al.

CASE NUMBER:
SCV-262127 POS1892930

**PROOF OF SERVICE OF SUMMONS**

Ref. No. or File No.:
Roundup - Andrade et al

**BY FAX**

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.
2. I served copies of: Civil Case Cover Sheet, Complaint, Summons, Additional Parties Attachment to Summons, Notice of Assignment to One Judge for All Purposes, Notice of CMC, and Order to Show Cause

3. a. Party served: Monsanto Company

   b. Person Served: Becky DeGeorge - CSC - Person Authorized to Accept Service of Process

4. Address where the party was served: 2710 N Gateway Oaks Dr, Ste 150
   Sacramento, CA 95833
5. I served the party
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on (date): 03/13/2018        (2) at   (time): 2:15PM
6. The "Notice to the Person Served" (on the summons) was completed as follows:


   d. on behalf of:

Monsanto Company
under: CCP 416.10 (corporation)
7. **Person who served papers**
   a. Name:        Spenser G. Fritz
   b. Address:     One Legal - 194-Marin
                   504 Redwood Blvd #223
                   Novato, CA 94947

   c. Telephone number: 415-491-0606
   d. The fee for service was: $ 40.00
   e I am:
      (3) registered California process server.
         (I) Employee or independent contractor.
         (ii) Registration No.:2016-05
         (iii) County: Sacramento

8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.
Date: 03/14/2018


Spenser G. Fritz
(NAME OF PERSON WHO SERVED PAPERS)                          (SIGNATURE)               Code of Civil Procedure, § 417.10

Form Adopted for Mandatory Use
Judicial Council of California POS-010
[Rev. Jan 1, 2007]
                        **PROOF OF SERVICE OF SUMMONS**        OL# 11802293

20998195

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Aimee Wagstaff, 36819<br>Andrus Wagstaff, PC<br>7171 West Alaska Drive<br>Lakewood, CO 80226<br>TELEPHONE NO.: (303)376-6360<br>ATTORNEY FOR *(Name)*: Plaintiff | **FILED**<br>MAR 2 1 2018<br>SUPERIOR COURT OF CALIFORNIA,<br>COUNTY OF SONOMA<br>BY___ MB ___ DEPUTY CLERK |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
Superior Court of California, Sonoma County
600 Administration Dr.
Santa Rosa, CA 95403-2818

**FILED**
ALAMEDA COUNTY
JUL 23 2018
CLERK OF THE SUPERIOR COURT
By *Michelle D antra*

PLAINTIFF/PETITIONER: Jaime Andrade, et al.
By *Michelle* D antra
DEFENDANT/RESPONDENT: Monsanto Company, et al.     MICHELLE BANKS. Deputy

| CASE NUMBER: |
|---|
| SCV-262127 |
| RG18921330 |

Ref. No. or File No.:
Roundup - Andrade et al

**PROOF OF SERVICE OF SUMMONS**

**BY FAX**

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.
2. I served copies of:   Civil Case Cover Sheet, Complaint, Summons, Additional Parties Attachment to Summons, Notice of Assignment to One Judge for All Purposes Notice of Case Management Conference and Order to Show Cause

3. a. Party served:  Wilbur-Ellis Company, LLC

   b. Person Served: Beverly Nerrett- Registered Agent Solutions, Inc.  - Person Authorized to Accept Service of Process
4. Address where the party was served: 345 California St., 27th Fl.
   San Francisco, CA 94104
5. I served the party
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on (date): 03/13/2018          (2) at (time): 4:04PM
6. The "Notice to the Person Served" (on the summons) was completed as follows:


   d. on behalf of:

Wilbur-Ellis Company, LLC
under: Other: Limited Liability Company
7. **Person who served papers**
   a. Name:        J. Alan Constant
   b. Address:     One Legal - 194-Marin
                   504 Redwood Blvd #223
                   Novato, CA 94947

   c. Telephone number: 415-491-0606
   d. The fee for service was: $ 88.00
   e I am:
      (3) registered California process server.
         (i)  Employee or independent contractor.
         (ii) Registration No.: 2015-0001199
         (iii) County: San Francisco
8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Date: 03/19/2018

*[signature]*

J. Alan Constant
(NAME OF PERSON WHO SERVED PAPERS)                                    (SIGNATURE)

| Form Adopted for Mandatory Use<br>Judicial Council of California POS-010<br>[Rev. Jan 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10<br>OL# 11802291 |
|---|---|---|

20998196

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address) | FOR COURT USE ONLY |
|---|---|
| Aimee Wagstaff, 36819<br>Andrus Wagstaff, PC<br>7171 West Alaska Drive<br>Lakewood, CO 80226<br>TELEPHONE NO.: (303)376-6360<br>ATTORNEY FOR (Name): Plaintiff | **FILED**<br>**MAR 2 1 2018**<br>SUPERIOR COURT OF CALIFORNIA,<br>COUNTY OF SONOMA<br>BY_____MB_____ DEPUTY CLERK |

**FILED**
**ALAMEDA COUNTY**
**JUL 23 2018**
CLERK OF THE SUPERIOR COURT
*Michelle Banks*
MICHELLE BANKS, Deputy

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
Superior Court of California, Sonoma County
600 Administration Dr.
Santa Rosa, CA 95403-2818

PLAINTIFF/PETITIONER: Jaime Andrade, et al.

DEFENDANT/RESPONDENT: Monsanto Company, et al.

| | CASE NUMBER: |
|---|---|
| **PROOF OF SERVICE OF SUMMONS** | SCV-262127 **20189021330** |
| | Ref. No. or File No.:<br>Roundup - Andrade et al |

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action. **BY FAX**

2. I served copies of: Civil Case Cover Sheet, Complaint, Summons, Additional Parties Attachment to Summons, Notice of Assignment to One Judge for All Purposes Notice of Case Management Conference and Order to Show Cause

3. a. Party served: Wilbur-Ellis Feed, LLC

   b. Person Served: Beverly Verrett - Registered Agent Solutions, Inc. - Person Authorized to Accept Service of Process

4. Address where the party was served: 345 California St., 27th Fl.
   San Francisco, CA 94104

5. I served the party
   a. by personal service. I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on (date): 03/13/2018    (2) at (time): 4:04PM

6. The "Notice to the Person Served" (on the summons) was completed as follows.

   d. on behalf of:

   Wilbur-Ellis Feed, LLC
   under: Other: Limited Liability Company

7. **Person who served papers**
   a. Name: J. Alan Constant
   b. Address: One Legal - 194-Marin
      504 Redwood Blvd #223
      Novato, CA 94947
   c. Telephone number: 415-491-0606
   d. The fee for service was: $ 40.00
   e I am:
      (3) registered California process server.
         (i) Employee or independent contractor.
         (ii) Registration No.: 2015-0001199
         (iii) County: San Francisco

8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Date: 03/19/2018

_____    _____
J. Alan Constant                              (SIGNATURE)
(NAME OF PERSON WHO SERVED PAPERS)

Code of Civil Procedure, § 417.10

Form Adopted for Mandatory Use
Judicial Council of California POS-010
[Rev. Jan 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

OL# 11802292

SUM-100

# AMENDED SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
MONSANTO COMPANY; WILBUR-ELLIS COMPANY, LLC; and
WILBUR-ELLIS FEED,LLC

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
JAIME ANDRADE (See Additional Parties Attachment)

| |
|---|
| FOR COURT USE ONLY<br>(SOLO PARA USO DE LA CORTE) |
| **ENDORSED**<br>**FILED**<br>APR 03 2018<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF SONOMA |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the Information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Sonoma-Hall of Justice<br>3600 Administration Drive<br>Santa Rosa, CA 95403 | CASE NUMBER:<br>*(Número del Caso):*<br>SCV262127 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Aimee H. Wagstaff, 7171 W. Alaska Drive, Lakewood, CO 80226 (866) 795-9529

| DATE:<br>*(Fecha)* APR 03 2018 | ARLENE D. JUNIOR | Clerk, by<br>*(Secretario)* | LORENA DELOZA | , Deputy<br>*(Adjunto)* |
|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* Wilbur-Ellis Company, LLC

under: ☐ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
☒ other *(specify):* Corporation Code 17701.16 (Limited Liability Company)
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

ENDORSED
FILED

APR 03 2018

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA

1  Aimee H. Wagstaff (CA Bar No. 278480)
   Aimee.wagstaff@andruswagstaff.com
2  **ANDRUS WAGSTAFF, P.C.**
   7171 W. Alask  Dr.
3  Denver, CO 80226
   Tel: (720) 208-9403
4  Fax: (303) 376-6361

5
   Kathryn M. Forgie (SBN 110404)
6  Kathryn.forgie@andruswagstaff.com
7  **ANDRUS WAGSTAFF, PC**
   6315 Ascot Drive
8  Oakland, California  94611
   Telephone: (720) 255-7623
9  Facsimile: (888) 875-2889

10
   **Attorneys for Plaintiffs** -
11

12      **THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,**

13          **IN AND FOR THE COUNTY OF SONOMA**

14

15  JAIME ANDRADE, MILDRED ADAMS,      ) **JCCP 4953 – IN RE: Roundup Products**
    RICHARD BARGAMIAN, RICKY           )
16  BIRDSELL, JUDY BORDE, ERIC         ) CASE NO: SCV262127
    BURGESS, JANICE CAMDEN, CHERYL     )
17  CHAPMAN, CAROL COLUCCI, COLIN      ) **JUDGE: Hon. Iona Petrou**
    CUNNINGHAM, ALFRED DELUCA,         )
18  RICHARD FULGENZI, BARRY FURSE,     ) **FIRST AMENDED COMPLAINT FOR**
19  BRADLEY GRIFFIN, RALPH LACAZE,     ) **DAMAGES FOR:**
    SHARON LUTTRELL, KATHY             )
20  MALCOLM, MICHAEL O'CON, DAVID      ) 1)  Strict Liability –Design Defect
    PASTORELLO, HAROLD ROY, JEFFREY    ) 2)  Strict Liability – Failure To Warn
21  SMITH, ROBERT STUMP, TINA          ) 3)  Negligence
22  THOMPSON, MATTHEW TORRES,          ) 4)  Breach Of Implied Warranty
    MICHELLE TYCZKI, ROBERT VELTRI,    ) 5)  Breach of Expressed Warranty
23  DONALD WAGNER, BRETT MOSSOTTI,     ) 6)  Punitive Damage
    LENA EBERHARDT,                    )
24          Plaintiffs,                ) **DEMAND FOR JURY TRIAL**
                                       )
25      vs.                            )
                                       )
26  MONSANTO COMPANY;                  )
27  WILBUR-ELLIS COMPANY, LLC, and     )
    WILBUR-ELLIS FEED, LLC             )
28          Defendants.                )

29
   COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**BY FAX**

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, Plaintiffs, Jaime Andrade, Mildred Adams, Richard Bargamian, Ricky Birdsell, Judy Borde, Eric Burgess, Janice Camden, Cheryl Chapman, Carol Colucci, Colin Cunningham, Alfred Deluca, Richard Fulgenzi, Barry Furse, Bradley Griffin, Ralph Lacaze, Sharon Luttrell, Kathy Malcolm, Michael O'Con, David Pastorello, Harold Roy, Jeffrey Smith, Robert Stump, Tina Thompson, Matthew Torres, Michelle Tyczki, Robert Veltri, Donald Wagner, Brett Mossotti, and Lena Eberhardt (hereinafter, collectively, "Plaintiffs") by and through their attorneys, Andrus Wagstaff, P.C., as and for the Complaint herein alleges upon information and belief the following:

## STATEMENT OF THE CASE

1.      In 1970, Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

2.      Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an

estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

3.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

4.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

5.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

7.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

8.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## JURISDICTION AND VENUE

9.     The California Superior Court has jurisdiction over this action pursuant to Constitution Article VI, Section 10, which grants the Superior Court "original jurisdiction in all causes except those given by statute to other trial courts." The Statutes under-which this action is brought do not specify any other basis for jurisdiction.

10.     The California Superior Court has jurisdiction over the Defendants because, based upon information and belief, each is a California resident, a corporation and/or entity organized under the laws of the State of California, a foreign corporation or association authorized to do business in California and registered with the California Secretary of State or has sufficient minimum contacts in California, or otherwise intentionally avails itself of the California market so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court pursuant to California Code of Civil Procedure Section 395(a) because at all relevant times Plaintiff Jaime Andrade resided in this county and the injuries alleged herein arose from conduct that occurred in this county.

12.     Furthermore, the Defendants have purposefully availed themselves of the benefits and the protections of the laws within the State of California. Monsanto has had sufficient

4

contact such that the exercise of jurisdiction would be consistent with the traditional notions of fair play and substantial justice.

13.     Plaintiffs seek relief that is within the jurisdictional limits of the Court.

## THE PARTIES

### Plaintiffs

14.     Plaintiff Jaime Andrade is a resident and citizen of California and was at all relevant times a resident of California.  Mr. Andrade purchased and used Roundup for at least 28 continuous years through approximately 2016, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

15.     Plaintiff Mildred Adams is a resident and citizen of California and was at all relevant times a resident of California. Ms. Adams purchased and used Roundup for at least 8 continuous years through approximately 2017, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2015.

16.     Plaintiff Richard Bargamian is a resident and citizen of California and was at all relevant times a resident of California. Mr. Bargamian purchased and used Roundup for at least 40 continuous years through approximately 2016, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

17.     Plaintiff Ricky Birdsell is a resident and citizen of California and was at all relevant times a resident of California. Mr. Birdsell purchased and used Roundup for at least 10 continuous years through approximately 2016, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

18.     Plaintiff Judy Borde is a resident and citizen of California and was at all relevant times a resident of California. Ms. Borde purchased and used Roundup for at least 30

5

continuous years through approximately 2017, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

19.     Plaintiff Eric Burgess is a resident and citizen of California and was at all relevant times a resident of California. Mr. Burgess purchased and used Roundup for at least 15 continuous years through approximately 2007, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2008.

20.     Plaintiff Janice Camden is a resident and citizen of California and was at all relevant times a resident of California. Ms. Camden purchased and used Roundup for at least 40 continuous years through approximately 2017, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

21.     Plaintiff Cheryl Chapman is a resident and citizen of California and was at all relevant times a resident of California. Ms. Chapman purchased and used Roundup for at least 20 continuous years through approximately 2017, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2006.

22.     Plaintiff Carol Colucci is a resident and citizen of California and was at all relevant times a resident of California. Ms. Colucci purchased and used Roundup for at least 30 continuous years through approximately 2016, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

23.     Plaintiff Colin Cunningham is a resident and citizen of California and was at all relevant times a resident of California. Mr. Cunningham purchased and used Roundup for at least 10 continuous years through approximately 2016, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2015.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

24.     Plaintiff Alfred DeLuca is a resident and citizen of California and was at all relevant times a resident of California. Mr. DeLuca purchased and used Roundup for at least 20 continuous years through approximately 2017, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2006.

25.     Plaintiff Richard Fulgenzi is a resident and citizen of California and was at all relevant times a resident of California. Mr. Fulgenzi purchased and used Roundup for at least 20 continuous years through approximately 2014, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

26.     Plaintiff Barry Furse is a resident and citizen of California and was at all relevant times a resident of California. Mr. Furse purchased and used Roundup for at least 15 continuous years through approximately 2017, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

27.     Plaintiff Bradley Griffin is a resident and citizen of California and was at all relevant times a resident of California. Mr. Griffin purchased and used Roundup for at least 35 continuous years through approximately 2015, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

28.     Plaintiff Ralph Lacaze is a resident and citizen of California and was at all relevant times a resident of California. Mr. Lacaze purchased and used Roundup for at least 20 continuous years through approximately 2011, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

29.     Plaintiff Sharon Luttrell is a resident and citizen of California and was at all relevant times a resident of California. Ms. Luttrell purchased and used Roundup for at least 10

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

continuous years through approximately 2012, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2008.

30.     Plaintiff Kathy Malcolm is a resident and citizen of California and was at all relevant times a resident of California. Ms. Malcolm purchased and used Roundup for at least 25 continuous years through approximately 2012, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

31.     Plaintiff Michael O'Con is a resident and citizen of California and was at all relevant times a resident of California. Mr. O'Con purchased and used Roundup for at least 5 continuous years through approximately 2015, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2015.

32.     Plaintiff David Pastorello is a resident and citizen of California and was at all relevant times a resident of California. Mr. Pastorello purchased and used Roundup for at least 8 continuous years through approximately 2000, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2013.

33.     Plaintiff Harold Roy is a resident and citizen of California and was at all relevant times a resident of California. Mr. Roy purchased and used Roundup for at least 30 continuous years through approximately 2017, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

34.     Plaintiff Jeffrey Smith is a resident and citizen of California and was at all relevant times a resident of California. Mr. Smith purchased and used Roundup for at least 20 continuous years through approximately 2012, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2009.

35.     Plaintiff Robert Stump is a resident and citizen of California and was at all relevant times a resident of California. Mr. Stump purchased and used Roundup for at least 30 continuous years through approximately 2012, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

36.     Plaintiff Tina Thompson is a resident and citizen of California and was at all relevant times a resident of California. Ms. Thompson purchased and used Roundup for at least 10 continuous years through approximately 2014, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

37.     Plaintiff Matthew Torres is a resident and citizen of California and was at all relevant times a resident of California. Mr. Torres purchased and used Roundup for at least 15 continuous years through approximately 2017, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2007.

38.     Plaintiff Michelle Tyczki is a resident and citizen of California and was at all relevant times a resident of California. Ms. Tyczki purchased and used Roundup for at least 5 continuous years through approximately 2016, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

39.     Plaintiff Robert Veltri is a resident and citizen of California and was at all relevant times a resident of California. Mr. Veltri purchased and used Roundup for at least 20 continuous years through approximately 2011, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2009.

40.     Plaintiff Donald Wagner is a resident and citizen of California and was at all relevant times a resident of California. Mr. Wagner purchased and used Roundup for at least 20

9

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

continuous years through approximately 2016, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2016.

41.     Plaintiff Brett Mossotti is a resident and citizen of Missouri and was at all relevant times a resident of Missouri. Mr. Mossotti purchased and used Roundup for at least 35 continuous years through approximately 2014, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2015.

42.     Plaintiff Lena Eberhardt is a resident and citizen of Missouri and was at all relevant times a resident of Missouri. Ms. Eberhardt purchased and used Roundup for at least 10 continuous years through approximately 2012, and was diagnosed with a form of Non-Hodgkin's lymphoma in 2008.

### Defendants

43.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.  At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®.  Monsanto has regularly transacted and conducted business within the state of California, and has derived substantial revenue from goods and products, including Roundup, used in the State of California.  Monsanto expected or should have expected their acts to have consequences within the State of California, and derived substantial revenue from interstate commerce.

44.     Defendants Wilbur-Ellis Company LLC is a California limited liability corporation with its headquarters and principal place of business in San Francisco, California.  At all times relevant to this complaint, Wilbur-Ellis Company, LLC sold and distributed Monsanto products including Roundup, within the State of California.

45.     Defendants Wilbur-Ellis Feed LLC (with Wilbur-Ellis Company LLC, hereinafter ("Wilbur-Ellis") is a California limited liability corporation with its headquarters and principal place of business in San Francisco, California.  At all times relevant to this complaint, Wilbur Ellis Feed, LLC sold and distributed Monsanto products including Roundup, within the State of California.

46.     Plaintiff is informed and believes, and based thereon alleges, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the Defendants was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendants and their directors, officers and/or managing agents.

## FACTS

47.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

48.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

49.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—

glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup® was safe.

### The Discovery of Glyphosate and Development of Roundup®

50.- The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use; Monsanto still markets Roundup® as safe today.

### Registration of Herbicides under Federal Law

51. The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

52. Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA,

however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

53.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

54.     The EPA and the State of California registered Roundup® for distribution, sale, and manufacture in the United States and the State of California.

55.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

56.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

57.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup

58.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

59.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

60.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

61.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

62.     Three top executives of IBT were convicted of fraud in 1983.

63.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

64.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

***The Importance of Roundup® to Monsanto's Market Dominance Profits***

65.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

66.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate;

farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

67.     Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable-product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has known for decades that it falsely advertises the safety of Roundup®.***

68.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

> a)      Remember that environmentally friendly Roundup herbicide is
>         biodegradable. It won't build up in the soil so you can use Roundup with
>         confidence along customers' driveways, sidewalks and fences ...

b)      And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)      Roundup biodegrades into naturally occurring elements.

d)      Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)      This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f)      You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)      Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)      Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i)      You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j)      "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

17

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

69.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)      its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk. ***

b)      its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable ***

c)      its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means. ***

d)      its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

e)      glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f)      its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

70.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

71.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

***Classifications and Assessments of Glyphosate***

72.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

73.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

74.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

75.   In assessing an agent, the IARC Working Group reviews the following information:

        a)      human, experimental, and mechanistic data;

        b)      all pertinent epidemiological studies and cancer bioassays; and

        c)      representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

76.   In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

77.   On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

78.   The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

79.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

80.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

81.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

82.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

83.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

84.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

85.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

86.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

87.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

88.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

*Other Earlier Findings About Glyphosate's Dangers to Human Health*

89.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

*Release Patterns*

90.     Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These

sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal, and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

91.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### Recent Worldwide Bans on Roundup®/Glyphosate

92.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

93.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

94.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

95.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

96.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

97.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

98.     On information and belief, Wilbur-Ellis was, at all relevant times, engaged in the distribution of Roundup, Roundup-ready crops and other glyphosate-containing products from Monsanto to retailers and commercial/agricultural users in California.

99.     Wilbur-Ellis had superior knowledge compared to Roundup users and any consumers including regarding the carcinogenic properties of the product, yet failed to accompany its sales and/or marketing of Roundup with any warnings or precautions for that grave danger. On information and belief, Wilbur-Ellis was one of the distributors providing Roundup and other glyphosate-containing products actually used by the Plaintiffs.

24

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

100.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

101.    The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiffs the true risks associated with Roundup and glyphosate.

102.    At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

103.    Indeed, even as of July 2016, Defendant continues to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and *agree* that there is *no evidence* that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic" (emphasis added).[1]

104.    As a result of Defendant's actions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiffs to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

105.    Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup

---

[1] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiffs or to distributors of Roundup. In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

106.   Plaintiffs had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiffs could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiffs and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## COUNT I
## STRICT LIABILITY (DESIGN DEFECT)

107.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

108.   Plaintiffs bring this strict liability claim against Monsanto for defective design.

109.   At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, and Monsanto engaged in the marketing, packaging design, and promotion of Roundup® products, which are defective and

unreasonably dangerous to consumers, including Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiffs, as described above.

110.    At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiffs.

111. - At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

112.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

113.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

114.    At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

115.    Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

a)      When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b)      When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c)      When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d)      Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

e)      Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

f)     At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g)     Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

h)     Monsanto could have employed safer alternative designs and formulations.

116.   Plaintiffs were exposed to Roundup® products in the course of their work, as described above, without knowledge of their dangerous characteristics.

117.   At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

118.   Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

119.   The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

120.   At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

121.   Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiffs herein.

122.   Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to Plaintiffs.

123.   The defects in Roundup® products caused or contributed to cause Plaintiffs' grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiffs would not have sustained their injuries.

124.   Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Plaintiffs, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn, or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

125.   As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiffs have suffered and continue to suffer grave injuries, and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages in an amount in excess of Twenty-

Five Thousand Dollars ($25,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

**COUNT II**
**STRICT LIABILITY (FAILURE TO WARN)**

126.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

127.   Plaintiffs bring this strict liability claim against Monsanto for failure to warn.

128.   At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and, specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

129.   Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiffs, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

130.   At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks.

31
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Monsanto had a continuing duty to warn the Plaintiffs of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

131.     At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

132.     At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including Plaintiffs.

133.     Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, marketed, promoted, supplied, or sold the product, and not known to end users and consumers, such as Plaintiffs.

134.     These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

135. At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted, and marketed by Monsanto.

136. Plaintiffs were exposed to Roundup® products in the course of their employment and/or personal use of Roundup, without knowledge of its dangerous characteristics.

137. At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

138. Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiffs' exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Monsanto.

139. These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and landscaping applications.

140. The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk

of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

141.    To this day, Monsanto has failed to adequately and accurately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

142.    As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by Plaintiffs in their work.

143.    Monsanto is liable to Plaintiffs for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

144.    The defects in Roundup® products caused or contributed to cause Plaintiffs' injuries, and, but for this misconduct and omissions, Plaintiffs would not have sustained their injuries.

145.    Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiffs could have avoided the risk of developing injuries as alleged herein.

146.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiffs have suffered severe injuries and have endured

physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00) together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

**COUNT III**
**NEGLIGENCE**

147.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

148.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs.

149.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

150.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

35
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

151.   At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

152.   Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

153.   Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

154.   As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

155.   Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

156.   Monsanto was negligent in the following respects:

a)      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b)      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c)      Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d)      Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e)      Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f)      Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

g)      Failing to disclose to Plaintiffs, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

h)      Failing to warn Plaintiffs, consumers, and the general public that the

product's risk of harm was unreasonable and that there were safer and effective

alternative herbicides available to Plaintiffs and other consumers;

i)      Systematically suppressing or downplaying contrary evidence about the

risks, incidence, and prevalence of the side effects of Roundup® and

glyphosate-containing products;

j)      Representing that its Roundup® products were safe for their intended

use when, in fact,       Monsanto knew or should have known that the products

were not safe for their intended purpose;

k)      Declining to make or propose any changes to Roundup® products'

labeling or other promotional materials that would alert the consumers and the

general public of the risks of Roundup® and glyphosate;

l)      Advertising, marketing, and recommending the use of the Roundup®

products, while concealing and failing to disclose or warn of the dangers known

by Monsanto to be associated with or caused by the use of or exposure to

Roundup® and glyphosate;

m)      Continuing to disseminate information to its consumers, which indicate

or imply that Monsanto's Roundup® products are not unsafe for use in the

agricultural and horticultural industries; and

n)      Continuing the manufacture and sale of its products with the knowledge

that the products were unreasonably unsafe and dangerous.

157.   Monsanto knew and/or should have known that it was foreseeable that consumers such as Plaintiffs would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

158.   Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

159.   Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, as described herein.

160.   Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of its products, including Plaintiffs, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

161.   As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiffs have suffered severe and permanent physical and emotional injuries. Plaintiffs have endured pain and suffering and have suffered economic losses (including significant expenses for medical care and treatment) in an amount to be determined.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00) together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT IV
## BREACH OF IMPLIED WARRANTIES

162.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

163.    At all times herein mentioned, the Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup as a broad-spectrum herbicide. These actions were under the ultimate control and supervision of Defendant.

164.    At the time Defendant marketed, sold, and distributed Roundup for use by Plaintiffs, Defendant knew of Roundup's intended use and impliedly warranted the product to be or merchantable quality and safe and fit for this use.

165.    The Defendant impliedly represented and warranted to Plaintiffs and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

166.    These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous. not of merchantable quality, and defective.

167.    Plaintiffs and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

168.    Plaintiffs reasonably relied upon the skill and judgment of Defendant as to whether Roundup was of merchantable quality and safe and fit for its intended use.

169.    Roundup was injected into the stream of commerce by the Defendant in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

40

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

170.   The Defendant breached the aforesaid implied warranties, as its herbicide Roundup was not fit for its intended purposes and uses.

171.   As a result of the foregoing acts and omissions, Plaintiffs suffered from NHL and Plaintiffs suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demands a jury trial on all issues contained herein.

## COUNT V
## BREACH OF EXPRESS WARRANTY

172.   Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

173.   At all relevant and material times, Defendant manufactured, distributed, advertised, promoted, and sold Roundup.

174.   At all relevant times, Defendant intended that the Defendant's Roundup be used in the manner that Plaintiffs used it, and Defendant expressly warranted that each Roundup product was safe and fit for use by consumers, that it was of merchantable quality, that its health and side effects were minimal, and that it was adequately tested and fit for tis intended use.

175.    At all relevant times, Defendant was aware that consumers, including Plaintiffs, would use Roundup products; which is to say that Plaintiffs were a foreseeable user of the Defendant's Roundup products.

176.    Plaintiffs purchased Roundup manufactured by Defendant.

177.    Defendant's Roundup products were expected to reach and did in fact reach consumers, including Plaintiffs, without any substantial change in the condition in which it was manufactured and sold by Defendant.

178.    Defendant expressly warranted that Roundup was safe and not dangerous to users.

179.    Defendant expressly represented to Plaintiffs, scientists, the agricultural community, and/or the EPA that Roundup was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce dangerous side effects in excess of those risks associated with other forms of herbicides, that the side effects it did produce were accurately reflected in the warnings, and that it was adequately tested and fit for its intended use.

180.    Defendant breached various express warranties with respect to Roundup including the following particulars: a) Defendant Monsanto's website expressly states that "[r]egulatory authorities and independent experts around the world have reviewed numerous long term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate based herbicides, causes cancer, even at very high doses, and that it is not genotoxic"[2] b) Defendant has expressly warrantied that Roundup is "safer than table salt" and "practically nontoxic."[3]

---

[2] http://www.monsanto.com/glyphosate/documents/no-evidence-of-carcinogenicity.pdf October 8. 2015.
[3] Reuters, Jun 14, 2015 UPDATE 2-French minister asks shops to stop selling Monsanto Roundup weedkiller.

181.    Roundup did not conform to these express representations because Roundup was not safe and had, at all relevant times, an increased risk of serious side effects, including non-Hodgkin's lymphoma, when used according to Defendant's instructions.

182.    Defendant fraudulently concealed information from Plaintiffs regarding the true dangers and relative risks of Roundup.

183.    The global scientific community is not, and was never, in agreement that Roundup is non-carcinogenic.

184.    Plaintiffs did rely on the express warranties of the Defendant herein.

185.    Plaintiffs, consumers, and members of the agricultural community relied upon the representation and warranties of the Defendant for use of Roundup in recommending, using, purchasing, mixing, handling, applying, and/or dispensing Roundup.

186.    The Defendant herein breached the aforesaid express warranties, as its product Roundup was defective.

187.    Defendant knew or should have known that, in fact, said representations and warranties were false, misleading, and untrue in that Roundup was not safe and fit for the use intended, and, in fact, produced serious injuries to the users that were not accurately identified and represented by Defendant.

188.    Defendant knew or should have known that, in fact, said warranties were false, misleading, and untrue in that there is evidence that Roundup is toxic, genotoxic, and carcinogenic and that scientists and/or regulatory authorities around the world are not in agreement that Roundup is not carcinogenic or genotoxic and that it is safe.

189.    As a result of the foregoing acts and omissions, the Plaintiffs suffered from life threatening NHL and suffered severe and personal injuries, which are permanent and lasting in

nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

190.   As a result of the foregoing acts and omissions, Plaintiffs have suffered and incurred damages, including medical expenses and other economic and non-economic damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## COUNT VI   -
## PUNITIVE DAMAGES

191.   Plaintiffs repeat and reiterate the allegations previously set forth herein.

192.   At all times material hereto, the Defendants knew or should have known that the product was inherently dangerous with respect to its health risk.

193.   At all times material hereto, the Defendants attempted to misrepresent and did misrepresent facts concerning the safety of the subject product.

194.   Defendants' misrepresentations included knowingly withholding material information from the public, including the Plaintiffs herein, concerning the safety of the subject products.

195.   At all times material hereto, the Defendants knew and recklessly disregarded the fact that human exposure to Roundup can and does cause health hazard, including non-Hodgkin's lymphoma.

196.   Notwithstanding the foregoing, the Defendants continued to aggressively market and apply the subject product without disclosing the aforesaid risks.

197.    Defendants knew of the subject products' defective and unreasonably dangerous nature as set forth herein, but continued to design, develop, manufacture, market, distribute, sell and apply it so as to maximize sales and profits at the expense of the health and safety of the public, including the Plaintiffs herein, in conscious and/or negligent disregard of the foreseeable harm caused by Roundup.

198.    The Defendants intentionally concealed and/or recklessly failed to disclose to the public, including the Plaintiffs herein, the potentially life threatening hazards of Roundup in order to ensure continued and increased sales.

199.    The Defendants' intentional and/or reckless failure to disclose information deprived the Plaintiffs of necessary information to enable Plaintiffs to weigh the true risks of using or being exposed to the subject product against its benefits.

200.    As a direct and proximate result of Defendants' conscious and deliberate disregard for the rights and safety of consumers such as the Plaintiffs, Plaintiffs suffered severe and permanent physical injuries. The Plaintiffs have endured substantial pain and suffering and have undergone extensive medical and surgical procedures. Plaintiffs have incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the future. The Plaintiffs have lost past earnings and have suffered a loss of earning capacity. The Plaintiffs have suffered and will continue to suffer economic loss, and have otherwise physically, emotionally and economically injured. The Plaintiff's injuries and damages are permanent and will continue into the future.

201.    The aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including the Plaintiffs herein, thereby deter them from similar conduct in the future.

WHEREFORE, Plaintiffs respectfully request judgement against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment against the Defendant on each of the above-referenced claims and causes of action and as follows:

1.     Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.     Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiffs' pain and suffering and for severe and permanent personal injuries sustained by the Plaintiffs including health care costs and economic loss;

3.     Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

4.     Pre-judgment interest;

5.     Post-judgment interest;

6.     Awarding Plaintiffs reasonable attorneys' fees;

7.     Awarding Plaintiffs the costs of these proceedings; and

8.     Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury as to all issues.

Dated: April 3, 2018

By: _____

46

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Aimee H. Wagstaff
Andrus Wagstaff, P.C.
7171 W. Alaska Dr.
Lakewood, CO 80226
Tel: 720-208-9403
Fax: 303-376-6361
Aimee.wagstaff@andruswagstaff.com

47

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL



20998193

**SUM-100**

# AMENDED SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
MONSANTO COMPANY; WILBUR-ELLIS COMPANY LLC; and
WILBUR-ELLIS FEED,LLC

~~FILED~~
~~ALAMEDA COUNTY~~
~~JUL 23 2018~~
~~CLERK OF THE SUPERIOR COURT~~
~~By Michelle Danta~~
~~MICHELLE BANKS, Deputy~~

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
JAIME ANDRADE (See Additional Parties Attachment)

> FOR COURT USE ONLY
> *(SOLO PARA USO DE LA CORTE)*
>
> **F I L E D**
> SUPERIOR COURT OF CALIFORNIA
> COUNTY OF SONOMA
>
> APR 03 2018
>
> BY _____
> Deputy Clerk

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

  You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

  There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

  *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

  *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is: <br> *(El nombre y dirección de la corte es):* Sonoma-Hall of Justice <br> 3600 Administration Drive <br> Santa Rosa, CA 95403 | CASE NUMBER: *(Número del Caso):* SCV 262127  1330 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Aimee H. Wagstaff, 7171 W. Alaska Drive, Lakewood, CO 80226 (866) 795-9529

| DATE: <br> *(Fecha)* | APR 03 2018 | ARLENE D. JUNIOR Clerk, by <br> *(Secretario)* | LORENA DELOZA Deputy <br> *(Adjunto)* |
|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

SCV – 262127
CVPS001
Summons Issued
54811

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

  under: ☐ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
      ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
      ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
      ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use <br> Judicial Council of California <br> SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465 <br> www.courtinfo.ca.gov |
|---|---|---|

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Jaime Andrade, et al v. Monsanto Company et al | SCV262127 |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (Check only one box. Use a separate page for each type of party.):

[✔] Plaintiff   [ ] Defendant   [ ] Cross-Complainant   [ ] Cross-Defendant

MILDRED ADAMS, RICHARD BARGAMIAN, RICKY BIRDSELL, JUDY BORDE, ERIC BURGESS, JANICE CAMDEN, CHERYL CHAPMAN, CAROL COLUCCI, COLIN CUNNINGHAM, ALFRED DELUCA, RICHARD FULGENZI, BARRY FURSE, BRADLEY GRIFFIN, RALPH LACAZE, SHARON LUTTRELL, KATHY MALCOM, MICHAEL O'CON, DAVID PASTORELLO, HAROLD ROY, JEFFREY SMITH, ROBERT STUMP, TINA THOMPSON, MATTHEW TORRES, MICHELLE TYCZKI, ROBERT VELTRI, DONALD WAGNER, BRETT MOSSOTTI, and LENA EBERHARDT.

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

20998192

**SUM-100**

# AMENDED SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
MONSANTO COMPANY; WILBUR-ELLIS COMPANY, LLC; and
WILBUR-ELLIS FEED,LLC

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
JAIME ANDRADE (See Additional Parties Attachment)

*FILED*
ALAMEDA COUNTY
JUL 23 2018
CLERK OF THE SUPERIOR COURT
By *Michelle Santos*
MICHELLE BANKS, Deputy

*FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)*

**F I L E D**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA

APR 03 2018

BY *[signature]*
Deputy Clerk

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: *(El nombre y dirección de la corte es)*: Sonoma-Hall of Justice 3600 Administration Drive Santa Rosa, CA 95403 | CASE NUMBER: *(Número del Caso):* SCV261330 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Aimee H. Wagstaff, 7171 W. Alaska Drive, Lakewood, CO 80226 (866) 795-9529

| DATE: *(Fecha)* APR 03 2018 | ARLENE D. JUNIOR Clerk, by *(Secretario)* LORENA DELOZA | Deputy *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010).)*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

SUM-200(A)

| SHORT TITLE:<br>Jaime Andrade, et al v. Monsanto Company et al | CASE NUMBER:<br>SCV262127 |
|---|---|

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.):*

[✓] Plaintiff  [ ] Defendant  [ ] Cross-Complainant  [ ] Cross-Defendant

MILDRED ADAMS, RICHARD BARGAMIAN, RICKY BIRDSELL, JUDY BORDE, ERIC BURGESS, JANICE CAMDEN, CHERYL CHAPMAN, CAROL COLUCCI, COLIN CUNNINGHAM, ALFRED DELUCA, RICHARD FULGENZI, BARRY FURSE, BRADLEY GRIFFIN, RALPH LACAZE, SHARON LUTTRELL, KATHY MALCOM, MICHAEL O'CON, DAVID PASTORELLO, HAROLD ROY, JEFFREY SMITH, ROBERT STUMP, TINA THOMPSON, MATTHEW TORRES, MICHELLE TYCZKI, ROBERT VELTRI, DONALD WAGNER, BRETT MOSSOTTI, and LENA EBERHARDT.

Page  2  of  2

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

20998189

POS-010

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Aimee Wagstaff, 36819
Andrus Wagstaff, PC
7171 West Alaska Drive
Lakewood, CO 80226
TELEPHONE NO.: (303)376-6360
ATTORNEY FOR *(Name):* Plaintiff

FOR COURT USE ONLY

**FILED**

APR 1 0 2018

SUPERIOR COURT OF CALIFORNIA,
COUNTY OF SONOMA
BY _____ H8 _____ DEPUTY CLERK

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
Superior Court of California, Sonoma County
600 Administration Dr.
Santa Rosa, CA 95403-2818

**FILED**
ALAMEDA COUNTY

JUL 23 2018

SUPERIOR COURT

CLERK OF

By _____ *Michelle Banks*, Deputy

PLAINTIFF/PETITIONER: Jaime Andrade, et al.

DEFENDANT/RESPONDENT: Monsanto Company, et al.

CASE NUMBER:

SCV-262027 1 8 9 2 1 3 8 0

**PROOF OF SERVICE OF SUMMONS**

Ref. No. or File No.:
Roundup - Andrade et al

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action. **BY FAX**

2. I served copies of:   Amended Complaint; Amended Summons

3. a. Party served:  Wilbur-Ellis Company, LLC

   b. Person Served: Registered Agent Solutions Inc.  - David Granoff - Person Authorized to Accept Service of Process

4. Address where the party was served:   345 California St., 27th Floor
   San Francisco, CA 94104

5. I served the party

   a. by personal service.  I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on (date): 04/04/2018       (2) at  (time): 3:12PM

6. The "Notice to the Person Served" (on the summons) was completed as follows:

   d. on behalf of:

   Wilbur-Ellis Company, LLC

   under: Other: Limited Liability Company

7. Person who served papers

   a. Name:      J. Alan Constant
   b. Address:   One Legal - 194-Marin
                 504 Redwood Blvd #223
                 Novato, CA 94947

   c. Telephone      415-491-0606
   d. The fee for service was: $ 75.00
   e. I am:
        (3) registered California process server.
            (i) Employee or independent contractor.
            (ii) Registration No.: 2015-0001199
            (iii) County: San Francisco

8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.
Date: 04/09/2018

J. Alan Constant
_____          _____
(NAME OF PERSON WHO SERVED PAPERS)                  (SIGNATURE)

Form Adopted for Mandatory Use
Judicial Council of California POS-010
[Rev. Jan 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10

OL# 11862810

2018 APR 10   PM 2 30

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State bar number, and address):* | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State bar number, and address):*
Aimee Wagstaff, 36819
Andrus Wagstaff, PC
7171 West Alaska Drive
Lakewood, CO 80226
TELEPHONE NO.: (303)376-6360
ATTORNEY FOR *(Name):* Plaintiff

**FILED**
**ALAMEDA COUNTY**

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
Superior Court of California, Sonoma County
600 Administration Dr.
Santa Rosa, CA 95403-2818

JUL 2 3 2018

CLERK OF THE SUPERIOR COURT
By _____
MICHELLE BANKS. Deputy

PLAINTIFF/PETITIONER: Jaime Andrade, et al.

DEFENDANT/RESPONDENT: Monsanto Company, et al.

**PROOF OF SERVICE OF SUMMONS**

**FILED**

APR 1 0 2018

SUPERIOR COURT OF CALIFORNIA,
COUNTY OF SONOMA
BY _____ MB _____ DEPUTY CLERK

CASE NUMBER:
SCV-262127

Ref. No. or File No.:
Roundup - Andrade et al

**BY FAX**

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.

2. I served copies of:   Amended Complaint; Amended Summons

3. a. Party served:   Wilbur-Ellis Feed, LLC

   b. Person Served: Registered Agent Solutions Inc - David Granoff  - Person Authorized to Accept Service of Process

4. Address where the party was served:   345 California St., 27th Floor
   San Francisco, CA 94104

5. I served the party
   a. by personal service.   I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on (date): 04/04/2018       (2) at   (time): 3:12PM

6. The "Notice to the Person Served" (on the summons) was completed as follows:


   d. on behalf of:

   Wilbur-Ellis Feed, LLC
   under: Other: Limited Liability Company

7. Person who served papers
   a. Name:     J. Alan Constant
   b. Address:     One Legal - 194-Marin
                   504 Redwood Blvd #223
                   Novato, CA 94947

   c. Telephone     415-491-0606
   d. The fee for service was: $ 40.00
   e. I am:
        (3) registered California process server.
            (i) Employee or independent contractor.
            (ii) Registration No.: 2015-0001199
            (iii) County:  San Francisco

8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Date:  04/09/2018

J. Alan Constant
_____
(NAME OF PERSON WHO SERVED PAPERS)

_____
(SIGNATURE)

Form Adopted for Mandatory Use
Judicial Council of California POS-010
[Rev. Jan 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure § 417.10

OL# 11862811

2018 APR 10   PM 2 30

20998191

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

Aimee Wagstaff, 36819
Andrus Wagstaff, PC
7171 West Alaska Drive
Lakewood, CO 80226
TELEPHONE NO.: (303)376-6360
ATTORNEY FOR *(Name):* Plaintiff

**FILED**
ALAMEDA COUNTY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
Superior Court of California, Sonoma County
600 Administration Dr.
Santa Rosa, CA 95403-2818

JUL 23 2018
CLERK OF THE SUPERIOR COURT
By *Michelle Banks*
MICHELLE BANKS, Deputy

PLAINTIFF/PETITIONER: Jaime Andrade, et al.

DEFENDANT/RESPONDENT: Monsanto Company, et al.

**FILED**
APR 10 2018
SUPERIOR COURT OF CALIFORNIA,
COUNTY OF SONOMA
BY ___MB___ DEPUTY CLERK

CASE NUMBER:
SCV-262127

RG18923330

Ref. No. or File No.:
Roundup - Andrade et al

BY FAX

**PROOF OF SERVICE OF SUMMONS**

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.
2. I served copies of:   Amended Summons, First Amended Complaint For Damages

3. a. Party served:  Monsanto Company

   b. Person Served: CSC - Mai Tang - Person Authorized to Accept Service of Process

4. Address where the party was served:   2710 N Gateway Oaks Dr, Ste 150
   Sacramento, CA 95833
5. I served the party
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to
   receive service of process for the party (1) on  (date): 04/04/2018      (2) at  (time): 2:02PM
6. The "Notice to the Person Served" (on the summons) was completed as follows:

   d. on behalf of:

   Monsanto Company
   under: CCP 416.10 (corporation)
7. **Person who served papers**
   a. Name:      Spenser G. Fritz
   b. Address:    One Legal - 194-Marin
                  504 Redwood Blvd #223
                  Novato, CA 94947

   c. Telephone number: 415-491-0606
   d. The fee for service was: $ 40.00
   e I am:
      (3) registered California process server.
          (i) Employee or independent contractor.
          (ii) Registration No.:2016-05
          (iii) County: Sacramento
8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.
Date: 04/06/2018

Spenser G. Fritz
(NAME OF PERSON WHO SERVED PAPERS)

(SIGNATURE)

Form Adopted for Mandatory Use
Judicial Council of California POS-010
[Rev. Jan 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10

OL# 11862809

2018 APR 10  PM 2 30

1  Aimee Wagstaff, SBN 278480
   aimee.wagstaff@andruswagstaff.com
2  Andrus Wagstaff, PC
   7171 West Alaska Drive
3  Lakewood, CO  80226
   Telephone: (303) 376-6360
4  Facsimile:  (303) 376-6361

5  *Attorney for Plaintiffs*

6

**FILED**
**ALAMEDA COUNTY**
**JUL 23 2018**
CLERK OF ... SUPERIOR COURT
By _Michelle Santa_
MICHELLE BANKS. Deputy

**F I L E D**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA
**APR 23 2018**
BY_____
Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**FOR THE COUNTY OF SONOMA**

7

8

9

10

11  JAIME ANDRADE, et al.,

12          Plaintiff,

     v.

13  MONSANTO COMPANY, et al.,
            Defendants.

14

15

16

Case No.: SCV-262127

R01892 1330

**NOTICE OF ADDITION AND TRANSFER**
**TO JCCP NO. 4953 (ALAMEDA COUNTY)**

SCV-262127
SS014
Case Assigned to JCC Case
57677

17  **TO THE CLERK OF COURT:**

18         NOTICE IS HEREBY GIVEN that the above-captioned Action is added and transferred to the

19  pending Coordination Proceeding *Roundup Products Cases* (JCCP No. 4953) pursuant to the

20  attached one-page Order.  In order to avoid unnecessary proceedings in this Court, the Parties

21  respectfully request that the Clerk of this Court transfer the pleadings and proceedings of this Action

22  to JCCP No. 4953 pending in Superior Court for the County of Alameda before the Honorable Ioana

23  Petrou.

24         Dated: April 19, 2018

25

26

27  By: X_____
        Aimee H. Wagstaff (CA Bar No. 278480)
28      **ANDRUS WAGSTAFF, PC**
        7171 West Alaska Drive
        Lakewood, CO 80226

BY FAX

1

**NOTICE OF ADDITION AND TRANSFER**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Phone: (303) 376-6360
Fax: (303) 376-6361
Email: aimee.wagstaff@andruswagstaff.com

2

**NOTICE OF ADDITION AND TRANSFER**

1

**PROOF OF SERVICE**

2

STATE OF COLORADO, COUNTY OF JEFFERSON,

3

     I am a resident and employed in the County of Jefferson, State of Colorado, over the age of 18

4

and not a party to the within action or proceedings; my business address is 7171 W. Alaska Drive, Lakewood, CO 80226.

5

     On April 19, 2018, I served the foregoing document(s) described as:

6

NOTICE OF ADDITION AND TRANSFER TO JCCP NO. 4953

7

on the interested parties and/or through their attorneys of record by depositing the original or true

8

copy thereof as designated below, at Lakewood, Colorado, addressed to the following:

9

Richard A. Clark (rclark@pmcos.com)
Steven R. Platt (splatt@pmcos.com)

10

PARKER, MILLIKEN, CLARK, O'HARA & SAMUELIAN, P.C.

11

555 S. Flower Street, 30th Floor

12

Los Angeles, CA 90071

    Joe G. Hollingsworth
    Eric G. Lasker
    Martin C. Calhoun
    HOLLINGSWORTH LLP
    1350 I Street, N.W.
    Washington, DC 20005

13

    Telephone: 202-898-5800
    Facsimile: 202-682-1639

14

    jhollingsworth@hollingsworthllp.com
    elasker@hollingsworthllp.com

15

    mcalhoun@hollingsworthllp.com

16

*Attorneys for Defendants*

17

MONSANTO COMPANY, WILBUR-ELLIS COMPANY LLC, AND WILBUR-ELLIS FEED, LLC

18

19

**(X)**    **BY MAIL:** I caused said document(s) to be deposited in the U.S. Postal Service in a sealed envelope with postage fully prepaid at Lakewood, Colorado, following the ordinary practice at my place of business of collection and processing of mail.

20

21

**( )**    **BY ELECTRONIC SERVICE:** I caused such document(s) to be served on the above referenced individual(s) by email transmission. The address of the sending computer and the address(es) of the receiving computers are listed as:

22

23

    a. Sending:

24

    b. Receiving:

25

**( X )**    (State) I declare under penalty of perjury under the laws of the State of Colorado that the above is true and correct.

26

27

    Executed April 19, 2018 at Lakewood, Colorado.

28

_____

    Aimee H. Wagstaff

3

**NOTICE OF ADDITION AND TRANSFER**

20910276

FILED
ALAMEDA COUNTY

APR 1 6 2018

CLERK OF THE SUPERIOR COURT
By _Pam. Williams_
                    Deputy

1

2

3

4

5

6

7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                    **FOR THE COUNTY OF ALAMEDA**

10  | COORDINATION PROCEEDING         | JCCP NO. 4953
11  | SPECIAL TITLE (RULE 3.550)      |
    |                                 | JUDGE IOANA PETROU
12  | ROUNDUP PRODUCTS CASES          | DEPARTMENT 17
    |                                 |
13  |                                 | [PROPOSED] CASE MANAGEMENT
    |                                 | ORDER NO. 6:  ADDITION OF CASES TO
14  | THIS DOCUMENT RELATES TO:       | JCCP AND TRANSFER OF CASES TO
    |                                 | ALAMEDA COUNTY
15  | ALL INCLUDED ACTIONS AND        |

16  *William Black v. Monsanto Company, et al.*, Case No. BC690972 (Los Angeles
17  County)

18  *Jaime Andrade, et al. v. Monsanto Company, et al.*, Case No. SCV262127
19  (Sonoma County)

20  *Sarah E. Starr v. Monsanto Company, et al.*, Case No. CGC-18-564200 (San
21  Francisco County)

22  *Taylor, et al. v. Monsanto Company, et al.*, Case No. CGC-18-565066 (San Francisco
23  County)

24  *Reynaldo Rivas, et al. v. Monsanto Company, et al.*, Case No. CGC-18-
25  565067 (San Francisco County)

26  *John Rabbers, et al. v. Monsanto Company, et al.*, Case No. CGC-18-
27  565068 (San Francisco County)

28

1   (continued)

2   *Charles Kast, et al. v. Monsanto*
3   *Company, et al.*, Case No. CGC-18-
     565070 (San Francisco County)

4   *Frances Gonzalez, et al. v. Monsanto*
     *Company, et al.*, Case No. CGC-18-
5   565071 (San Francisco County)

6

7        For good cause shown, the Court hereby orders as follows:

8        The cases listed below shall be added to JCCP 4953 and transferred to Department 17 of

9   this Court:

| Case Name | Case No. | Venue (County) |
|---|---|---|
| *Black v. Monsanto Company, et al.* | BC690972 | Los Angeles |
| *Andrade, et al. v. Monsanto Company et al.* | SCV262127 | Sonoma |
| *Starr v. Monsanto Company, et al.* | CGC-18-564200 | San Francisco |
| *Taylor, et al. v. Monsanto Company et al.* | CGC-18-565066 | San Francisco |
| *Rivas, et al. v. Monsanto Company, et al.* | CGC-18-565067 | San Francisco |
| *Rabbers, et al. v. Monsanto Company, et al.* | CGC-18-565068 | San Francisco |
| *Kast, et al. v. Monsanto Company, et al.* | CGC-18-565070 | San Francisco |
| *Gonzalez, et al. v. Monsanto Company, et al.* | CGC-18-565071 | San Francisco |

20

21   IT IS SO ORDERED.

22

23   Date: _____, 2018

24

25                     HONORABLE IOANA PETROU

26

27

28

- 1 -

CMO NO. 6: ADDITION OF CASES TO JCCP AND TRANSFER TO ALAMEDA COUNTY

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF SONOMA<br>CIVIL DIVISION<br>600 ADMINISTRATION DRIVE, ROOM 107-J<br>SANTA ROSA, CALIFORNIA 95403-2878<br>(707) 521-6500<br>sonoma.courts.ca.gov<br>**FILED**<br>ALAMEDA COUNTY<br>JUL 23 2018 | (FOR COURT USE ONLY)<br>**FILED**<br>APR 2 4 2018<br>SUPERIOR COURT OF CALIFORNIA,<br>COUNTY OF SONOMA<br>BY_____ DEPUTY CLERK |
|---|---|
| Andrade vs Monsanto Company CLERK OF THE SUPERIOR COURT<br>By _Michelle Banks_<br>MICHELLE BANKS. Deputy<br>**NOTICE OF COORDINATION** | Case number: SCV-262127<br>RG18921330 |

TO:    Superior Court of California, Alameda County

Transmitted herewith are copies of all of the documents that constitute the entire file in the above entitled action. This action is transferred to your jurisdiction pursuant to the Notice of Addition and Transfer to JCCP No. 4953 (Alameda County) filed on 04/23/18.

The Judicial Council title and number for this case has been assigned as follows:
**Roundup Product Cases - JCCP No. 4953 (Alameda County)**

Date: 4/24/2018

Arlene D. Junior
Court Executive Officer

by _____
Jennifer Ellis, Deputy Clerk

SCV-262127

## PROOF OF SERVICE BY MAIL

      I certify that I am an employee of the Superior Court of California, County of Sonoma, and that my business address is 600 Administration Drive, Room 107-J, Santa Rosa, California, 95403; that I am not a party to this case; that I am over the age of 18 years; that I am readily familiar with this office's practice for collection and processing of correspondence for mailing with the United States Postal Service; and that on the date shown below I placed a true copy of the foregoing attached papers in an envelope, sealed and addressed as shown below, for collection and mailing at Santa Rosa, California, first class, postage fully prepaid, following ordinary business practices.

4/24/2018

      Arlene D. Junior
      Court Executive Officer

by_____
Jennifer Ellis, Deputy Clerk


## ADDRESSEES

*Superior Court of California, County of Alameda*
Attn: Judge Ioana Petrou  Department 17
re: Roundup Product Cases JCCP 4953
1225 Fallon Street
Oakland, CA 94612